No. 3771.

Court of Appeal, Parish of Orleans.

## J. K. ARMSBY AND COMPANY vs. JOHN T. BRYANT.

This was a suit to recover of the defendant the difference between the agreed purchase price and the price subsequently obtained at a public sale, of a shipment of merchandise ordered by the defendant of plaintiff and which the defendant declined to receive and pay for. The ground of rejection was failure to ship the goods within the time contemplated by the contract.

Held: The defense is not sustained and plaintiff can recover.

Appeal from Civil District Court, Division "A."

Saunders & Gurley, for Plaintiff and Appellee.

Clegg & Quintero, for Defendant and Appellant.        . .

MOORE, J. This was a suit to recover of the defendant the difference between the agreed purchase price and the price subsequently obtained at a public sale, of a shipment of merchandise ordered by the defendant of plaintiff, and which the defendant declined to receive and pay for.

The answer tenders the general issue.

There was judgment for plaintiff for the amount sued for and defendant appealed.

The only question in the case is as to the date at which the shipment was made by the plaintiff.

The facts are as follows:

Plaintiff is a corporation doing business in San Francisco, E. A. Morphy being its agent and representative in the City of New Orleans. Defendant, who resides in the latter city, is "the business representative of foreign mercantile concerns in Bluefields, Nicaragua."

On the 26th day of September, 1903, defendant gave to the plaintiff's representative Morphy an order to be filled by the latter's principal, subject to the confirmation of plaintiff, for one car load of choice pink beans, the price thereof being $3.00/100 per hundred weight; payable therefor to be made by defendant honoring plaintiff's sight draft, with bill of lading annexed

therto, for the total price of the shipment on its arrival in New Orleans, the place stipulated for delivery. As the beans were intended by the defendant for foreign shipment it was agreed that they should be "doubled sacked," that is to say that an additional sack was to be put over the sacks in which the beans are originally packed.

No time for the delivery of the goods was stipulated or discussed, but it was understood that the order was for "prompt shipment." It is shown that "prompt shipment" as understood in the trade, means that the goods are to be delivered to the carrier at the initial shipping point within ten days from the consumation of the sale, two or three days being additionally allowed when the process of "double sacking" is required.

Upon the receipt of this order Morphy at once telegraphed same to his principal, the plaintiff, who confirmed the sale on the 28th September by wire, and Morphy at once notified defendant of the confirmation. Morphy testifies that it is usual to forward shipping instructions only after the order has been confirmed, but that in this instance and as a favor to defendant, he did not wait for the confirmation but he at once, on the 26th day of September, mailed the plaintiff these directions, which could not be conveyed by a telegraphic message as the marks were of a character not susceptible of electrical conveyance. He did this to save time as it takes from between five and six days *for* mail communication between New Orleans and San Francisco.

Morphy's letter reached plaintiff on the 1st October and the latter at once ordered the shipment made from the ware-house of the Southern Pacific Milling Company at Lompoc, California.

On the 3rd day of October plaintiff addressed the following letter to the Milling Company.

San Francisco, Oct. 3rd, 1903.

S. P. Milling Co.
        Lompoc, Cal.

Gentlemen:

Referring to your favor of Oct. 2, in reference to double sack-

232

ing beans we want you to double sack and ship by the middle of next week sure, to our order, notify A. E. Morphy, New Orleans, La., via Sunset and weigh up and mark as follows:

100 sack (Sic) Mark Mo. 1.

J. Q. A.
Bluefield, Nic.

Mark the balance of the car, enough to make 30,000 ℔, No. 1.

B.
Bluefield, Nic.

Be very careful as to the marks and be sure these beans are double sacked.

We are to-day sending you stencils for the reason if these beans are not marked as above stated there will be a price of $1.00 per bag, as the beans are for export shipment. Be sure the stock is choice and clean. Let us know when you can ship another car of Pinks, as we want to get them out just as soon as they are ready for delivery.

Yours truly,

(Signed)                                    J. K. Armsby Co.

On the 4th October the Milling Company acknowledged receipt of this letter and advised the plaintiff that the beans will be double sacked and marked with the stencils, the receipt of which was acknowledged, and advising that the beans "will be shipped as soon as possible."

On the 7th day of October a car load of double sacked choice pink beans marked as directed, and which conformed to the shipping directions furnished by defendant to Morphy, was sent forward by the Milling Company from Lompoc to New Orleans in car C. P. 70506.

Lompoc, it is shown, is a small town from which no formal bills of lading are issued by the railroad officials at that point. From there and at other points outside of the common shipping points of the road in California, what is known as "shipping receipts" are issued for through freight on the form of the Railroad Company, which can be, and as it is stated on their face, exchanged for bill of lading at points where bills of lading are issued.

In this instance a "shipping receipt" was issued by the agent at Lompoc of the Southern Pacific Company, the carrier to whom the goods were delivered, dated October 7th, 1903. This "shipping receipt" differs from a formal bill of lading, so far as we can discover, only in name and, may be in the restricted authority of the rail roads officials, outside of common shipping points, to sign a formal bill of lading. All the terms, conditions and stipulations of the bill of lading which was subsequently issued in this case are embraced and included in the shipping receipt. At any rate the shipping receipt, showing that the assignment was made to J. K. Armsby Co. "notify A. E. Morphy;" that the destination of the goods was New Orleans; that the car was C. P. 70506, and containing the marks as appears on the articles shipped, which marks correspond with these furnished by defendant to Morphy, was mailed from Lompoc to plaintiff at San Francisco.

Under the stipulation of the shipping receipt to the effect: "This shipping receipt when covering through shipments can be exchanged for bill of lading at points where bills of lading are issued," the plaintiff might have exchanged it for a bill of lading at San Francisco, Los Angeles, San Jose, Stockton or Sacramento, all common shipping points as shown by the evidence, or at *any other* point, at the option of the holder and owner thereof, "where bills of lading are issued," and might have made the exchange at such time as might have suited his pleasure or convenience. The exchange has nothing to do with the movement of the car in which the goods are shipped. The car goes on without regard to the time or place when the exchange is made.

In the instant case it pleased the plaintiff, as it was natural that it should, as it was the plaintiff's place of business, that the exchange should be made at San Francisco. Therefore, on the 12th day of October, 1903, the plaintiff endorsed the shipping receipt as follows: "G. W. Fletcher (who was the General Agent of the Southern Pacific Railway Company at San Francisco,) please issue us B. L. our order, notify J. T. Bryant, 137 Decatur St. Ship to Thalia St. wharf, New Orleans, La., and

oblige." (Signed) J. K. Armsby Co.

Thereupon a final bill of lading was issued to the plaintiff of the same tenor and date of the shipping receipt, which latter was then surrendered to the carrier. The *sole* change in the bill of lading was the instruction to the carrier as to who should be notified in New Orleans when the goods reached the City. Originally the plaintiffs had instructed the notification to be made to its agent, Morphy; subsequently, and when the bill of lading was issued, it instructed the carrier to notify the defendant direct.

When the bill of lading was obtained (Oct. 12/03) plaintiff drew to sight draft on the defendant for $1090.12/100, the price, as per agreement of the shipment, and, annexing the bill of lading thereto duly endorsed, transmitted same through the Nevada National Bank of San Francisco, and by the latter to the Hibernia Bank & Trust Company of New Orleans for presentment to and payable by defendant.

The draft, with bill of lading annexed, reached New Orleans on the 17th day of October, 1903, the car of beans arrived on the 21st day of that month. When the beans arrived in New Orleans the market price of beans had fallen whereupon the defendant, refused to pay the draft and to accept the goods. After due notice to the defendant the beans were sold, at the instance of plaintiff, at public auction; the result being a deficit in the price of Two Hundred and Eighty-nine 65/100 Dollars, the amount sued for.

The defendant testifies that the only reason he had for rejecting the shipment was because he suspected, and still suspects, the good faith of plaintiff as to their representation that the goods had actually been shipped on the 7th day of October direct to New Orleans. He admits that the plaintiff is not responsible under the contract and the custom of the trade, (if the goods were actually delivered to the carrier on the 7th day of October for transit direct to New Orleans,) for the delay of the carrier in making delivery. "The Armsby Company," he testifies, "do not guarantee that;" they "do not guarantee it (the goods) will be there at the time."

It is the date at which the shipment was made that is the subject of his suspicion. It appears that he had wired the plaintiff on the 15th Oct. inquiring whether or not the beans had been shipped.

To this the plaintiff promptly wired back that the goods had been shipped on the 7th October and that plaintiff would have the carrier at once put a "tracer" on the car. This, it is shown, was not done, and the car, as stated, arrived in New Orleans on the 21st October. When, however, the sight draft and the bill of lading attached, were exhibited to him on the 17th October he says that at once he noticed that the former was dated Oct. 12th and the latter Oct. 7th, his suspicions were aroused and that he concluded that the shipment had not actually been made until the 12th Oct. the date of the draft, and that the bill of lading had been antidated, and he therefore determined that he would not accept delivery of the goods and pay the draft, and he did not.

Whilst this cause, as all others, must be determined by the facts as they appear by the record, and not upon the suspicions of the parties, we cannot but remark that the *mere* fact of a draft to which is annexed a bill of lading, bearing a date subsequent to the date of the latter, furnishes no just ground for the slightest suspicion that the date of the bill of lading is false, and that, as the result of a conspiracy between the shipper and the carrier, the bill of lading is antidated so as to enable the perpetration of a fraud on a third person.

Where shipments are to be paid for, as in the instant case, cash on delivery by sight draft with bill of lading attached, the shipper may draw his draft at any time it pleases him to do so, provided that its presentation for payment is not so delayed as to prevent a prompt delivery of the goods. When, therefore, the defendant herein chose to suspect bad faith on the part of plaintiff simply because its sight draft was dated subsequently to the date of the bill of lading, and from that fact concluded in his own mind, and without further inquiry, that the shipment had not been made until the date which the sight draft bore, Oct. 12th, and acted upon this suspicion, he did so at the peril and must

take the consequences of his hasty and ill-advised action if it transpires, as it is overwhelmingly shown to be the case, that his suspicions were utterly unfounded.

It is shown by the representatives of the Milling Company at Lompoc; by the carrier's agent at that point; by the carrier's General Agent at San Francisco; by the shipping receipt issued at San Francisco in exchange for the shipping receipt; by the carrier's "tracing" report' and by the carrier's way bill, that the car load of beans was shipped from Lompoc, under *through routing,* to New Orleans on the Seventh day of October. The shipping receipt; the bill of lading, and the freight bill show on their face, not only the date and place of shipment, but the marks of the goods and place of destination; and every one of these documents show the number and initials of the car in which the goods were loaded at Lompoc on the 7th October; to wit, Car No. 70506 C. P.; and the notification to defendant of the arrival of the goods and the freight bill therefor presented to him for payment, showed on their face that this identical car— 70506 C. P.—had reached New Orleans from Lompoc containing the goods indicated by the marks stated in the bill of lading.

It is contended by the defendant, to quote from the brief of his counsel, that: "When the goods were purchased of Armsby Co., at San Francisco, the defendant had the right to believe and did believe, that they had a stock on hand for prompt shipment, but it appears from the testimony that Armsby Co., had to purchase the beans after they received the order, and that they purchased them in the interior of California, shipepd them to themselves at San Francisco, and rebilled them thence to New Orleans" and that "in this way nearly a month's time was consumed between agreements to sell and delivery." To the extent only that he plaintiff purchased the beans after receiving the order and then shipped them to New Orleans, is this contention sustained by the record. There is not the vaguest suggestion in the record that the beans were "purchased in the interior of California, shipped to themselves (Plft. Co.) at San Francisco, and rebilled by them thence to New Orleans." On the contrary the evidence is absolutely uncontradicted that at once the

plaintiff company received defendant's order it purchased the beans of the S. P. Milling Company at Lompoc and ordered them double sacked and shipped without delay, *by through freight to New Orleans,* under the marks and shipping directions furnished by the defendant and which are recited in plaintiff's communication to the Milling Company, *supra;* that the shipment was made *direct, from Lompoc to New Orleans on the 7th day of October* and that the beans reached the latter City *in the same car in which they were shipped from Lompoc.*

The shipment from Lompoc, so far as the question of time is concerned was an advantage to defendant, forasmuch as Lompoc is three hundred and fourteen miles south of San Francisco, and hence just that many miles nearer to New Orleans, than is San Francisco.

As showing that the plaintiff Company was not the owner of the beans on the 7th day of October and that therefore no shipment of beans on that day could be said to have been made by it for delivery at New Orleans to defendant our attention is called to the fact that the way bill, or routing sheet, and the expense (freight) bill show way-bill dating of Oct. 13th and that the Milling Company's bill to plaintiff for the beans sold by it to plaintiff is dated Oct. 9th; all subsequent to the alleged shipment on the 7th.

The way bill, or routing sheet, is dated at Los Angeles, on the 13th October, Los Angeles, however, is 181 miles south of Lompoc and 495 miles nearer to New Orleans than is San Francisco, and, as is shown by the letters of plaintiff offered in evidence by defendant, is a billing or shipping point on the Southern Pacific Railroad. This way bill purports to be a statement of loaded cars on east bound frieght forwarded this date," and under the heading "original point and through way bill reference," is found the statement that car C. P. 70506 is received from Lompoc—date *October 7th* —destination *New Orleans.* So also in the freight, or expense bill, which, by the way, is dated at New Orleans, Oct. 22, 1903, is mention made, under proper printed headings, that the "way bill" is issued at Los Angeles, Oct. 13, but that "original point of shipment" is Lompoc.

The S. P. Milling Company's bill to the J. K. Armsby Co. is dated Oct. 9th, 1903. That this is the date at which the bill was made out. At the proper and usual column on the face of the bill, intended to indicate the date of purchase, appears the date of purchase, "October 7th."

Our esteemed brother of the lower Court who heard the testimony of both the defendant and the agent of the plaintiff corporation correctly appreciated same as well as the other evidence in the cause and resolved the case against the defendant. The judgment is not error and it is affirmed.